NOTICE

Decision filed 09/08/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190519-U

NO. 5-19-0519

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 18-CF-85 |
| | ) | |
| ALAN SHIELDS, | ) | Honorable |
| | ) | Brian D. Lewis, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Moore and Wharton concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court's judgment is affirmed where defendant failed to establish ineffective assistance of trial counsel, and the trial court's sentence is affirmed where the court did not improperly consider a factor inherent in the offense.

¶ 2   Defendant, Alan Shields, appeals arguing that his trial counsel provided ineffective assistance and the trial court erroneously considered a factor inherent in the offense during his sentencing. We disagree.

¶ 3                                    I. BACKGROUND

¶ 4   Following incidents occurring on February 18, 2018, defendant was charged with six counts by information: (1) aggravated battery of a child in violation of section 12-3.05(b)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-3.05(b)(2) (West 2018)); (2) aggravated battery in violation of section 12-3.05(d)(4) of the Code (*id.* § 12-3.05(d)(4)) due to biting correctional

1

officer Rick Burgrabe in the execution of his duties; (3) threatening Marion police officer Noah Warren in the performance of his official duties by stating, "I'm going to spit on you and hurt you" and "As soon as I get out of jail I am going to put a hit out to have you killed" in violation of section 12-9(a) of the Code (*id.* § 12-9(a)); (4) criminal trespass to real property in violation of section 21-3(a)(3) of the Code (*id.* § 21-3(a)(3)); (5) disorderly conduct in violation of section 26-1(a)(1) of the Code (*id.* § 26-1(a)(1)); and (6) aggravated battery in violation of section 12-3.05(d)(4) of the Code (*id.* § 12-3.05(d)(4)) due to spitting on arresting officer Doug Schrock.

¶ 5　　On June 5, 2018, defendant presented three motions *in limine*. The first alleged Rule 412(a) and (b) (Ill. S. Ct. R. 412(a), (b) (eff. Mar. 1, 2001)) violations, claiming the State failed to disclose the content of expected witness testimony from Officer Schrock, Officer Burgrabe, and Martha Jennings. The motion requested an order prohibiting the State from introducing evidence or testimony from these witnesses. In response, the State indicated that all three witnesses would be testifying as to what took place based on Officer Warren's report and affidavit.

¶ 6　　After reviewing the relevant documents, the trial court stated,

　　　　"Regarding Officers Burgrabe and Schrock, it does not appear that there are any statements attributed to them that have been disclosed. *** I believe then they can testify about the incident that allegedly occurred between themselves and the defendant as to what happened because I think that is spelled out pretty clearly in the police report, but I don't believe they should be allowed to testify as to any statements they made or any statements the defendant made. They can testify as to what happened [and] why they were there *** but not any other narrative statement or *** anything they said, [or] anything anybody else said at that point."

With regard to Ms. Jennings, the State was ordered to make the witness available to defendant.

2

¶ 7    Defendant's second motion *in limine* requested an order prohibiting the State from introducing evidence or testimony about the number of times or reasons for the police being at defendant's residence. Defense counsel argued that the motion was based on hearsay and was related to the dispatch message provided to Officer Warren regarding a complaint by the mother of one of the children. The State advised that it was filing a motion to dismiss counts I, IV, and V and stated that "would take care of that." In response the court dismissed counts I, IV, and V, and stated, "I think we'll just *** wait and see what happens. If the dispatcher doesn't testify, I don't think it really comes into play."

¶ 8    Defendant's third motion *in limine* requested the State be prohibited from presenting any evidence or testimony regarding the dismissed charges. The State asked if it would be able to discuss why the officers were originally dispatched, and the court responded,

> "I think perhaps what *** might be appropriate and a way to resolve the issue would be *** [to] say they were dispatched there regarding an incident or regarding a disturbance, that as a result of that disturbance, they were placing the defendant under arrest. *** [T]hat gets everybody why they were there and what was going on without stating any specific crimes or incidents that occurred *** so you would not be influencing the jury ***. So I think if you can get your witnesses to go along those lines, that should take care of that. Very general, in other words."

¶ 9    The State agreed to proceed in this manner. After determining no other issues needed to be addressed, jury selection was completed, and the court recessed for the day.

¶ 10    On June 6, 2018, prior to the start of the trial, the State addressed the motions *in limine* and asked whether defendant's outstanding warrant from Jackson County could be mentioned. The defense objected after it was determined the warrant was for resisting arrest and obstruction. In

response, the trial court stated that no mention of the warrant could be made. Thereafter, the defense advised the court that it interviewed Ms. Jennings and stated that if the State did not call her as a witness, defense wanted to call her as a witness for the defense.

¶ 11   Following opening arguments, the State called Ms. Jennings to testify. Ms. Jennings admitted making a 911 call on February 18, 2018, related to a disturbance outside her home. She stated that she saw the police respond to the street outside her home and that a man in a wheelchair was in the middle of the street when police arrived. She stated that she watched "off and on" and eventually noticed the man had a thing over his head, so she assumed he spit on the police. She stated the man was cussing the police and saying bad things to the police officers. She identified the man in the wheelchair as defendant. She stated the incident lasted between 25 and 35 minutes. She also agreed she called the police due to concerns for defendant's safety.

¶ 12   On cross-examination, Ms. Jennings confirmed she did not wear glasses or contacts and admitted having recent eye surgery for cataracts. When asked if she was inside or outside the home, Ms. Jennings stated, "Well, my daughter lives right around the corner from me. We were walking home; and we walked past them, and they were fighting in the yard." She said she was in the house when the police arrived. She confirmed seeing defendant in his wheelchair and later on the other side of the police car on the ground. She stated she did not see the police touch defendant, but again stated she was only looking "off and on" and did not see the whole process. She stated she did not see defendant spit on any officer, only the spit hood. She also confirmed that defendant was cussing "a very, very lot." She then stated she heard defendant tell the officers that he was "going to get their paycheck and that he was a veteran and was going to sue the town and all that stuff." She confirmed she only heard a threat of financial harm. She further testified that she did not see any guns or tasers drawn and did not see defendant tased.

4

¶ 13    Following Ms. Jennings's testimony, the State requested a side bar at which time it advised the court that defense counsel opened the door as to the incident for which the officers were dispatched. Defense counsel stated he referred to the incident as a disturbance. The trial court stated, "Yeah, I don't think we need to go into it" and the trial resumed.

¶ 14    The State next called Officer Warren, who confirmed the Marion police were responding to a disturbance on February 18, 2018. When he arrived, he saw Officer Schrock talking to a black male in a wheelchair in the middle of the road. He identified defendant as the man in the wheelchair. He testified that he witnessed defendant spit in the face of Officer Schrock. Thereafter, a spit hood was placed over defendant's head to prevent him from spitting on anyone else. Defendant asked for an ambulance, and one was called.

¶ 15    Officer Warren testified that he was in the room with defendant at the hospital. When it was just the two of them, defendant made various statements including: "I can do whatever I want to the police, they can't touch me"; "I won't be prosecuted for anything. I even set a police department on fire, and they let me go because they are bitches"; "As soon as I get to jail, I will do something outrageous so they will have to let me go"; "As soon as you let me, I will spit on you and hurt you"; and "As soon as I get out of jail, I'm going to put out a hit and have you killed." The officer confirmed he was on duty at that time and stated the threat was serious enough to relay the message to the Williamson County Sheriff's Department.

¶ 16    Officer Warren testified that after defendant was released from the hospital, he was transported by ambulance to the jail. He stated that defendant remained in a wheelchair and continued to be aggressive towards police presence. He advised the correctional officers at the jail that defendant threatened to bite, spit, or do something to harm them.

¶ 17    On cross-examination, Officer Warren confirmed that defendant remained in his wheelchair until he and another officer removed him by each taking a wrist and guiding him to the ground. He stated that defendant was struggling and agreed that defendant's face touched the ground at some point when he was being detained and placed in handcuffs. Officer Warren explained that defendant was asked to put his hands behind his back but instead defendant clenched his fists, tightened up, and refused the officers' efforts. The officer testified that a taser was deployed twice but only made contact once. The officer stated defendant was extremely uncooperative. He stated that defendant spit on Officer Schrock after defendant was handcuffed and was being placed back in his wheelchair. He agreed that when defendant spit he had blood in his mouth and stated no threat of being spit upon was issued prior to the incident. The officer stated defendant just "hocked up a loogie" and spit in Office Schrock's face. Thereafter a spit hood was placed on defendant. He stated that he did not believe defendant was intoxicated. As soon as defendant was placed in handcuffs, defendant requested an ambulance.

¶ 18    Officer Warren testified that prior to trying to cuff defendant, defendant had a cut on his right ear and was bleeding from his mouth. He testified that defendant did not sustain these injuries from police contact. Officer Warren stated that defendant did not want to talk about his mouth injury. He agreed there was blood on defendant's mouth but did not see any dirt.

¶ 19    Officer Warren testified that when he was in the hospital room, defendant was turned away from him. He agreed that when defendant made the threats, he did not mention the officer by name or description. He further agreed that defendant did not mention where the officer lived, how he would find the officer, or anything along those lines. Officer Warren confirmed there was no one else in the room so he did not know who defendant was speaking to if he was not speaking to him. The officer stated it was possible, but unlikely, that defendant was speaking the threats to himself.

6

Officer Warren did not see defendant injure Officer Burgrabe. He only witnessed the injury later and took a picture of the injury. He stated the skin was broken and the officer was bleeding. He did not know if the officer required stitches, although he did know the officer later sought treatment at the hospital.

¶ 20    The State next called Officer Schrock, who agreed that he was responding to a disturbance on the day of the incident. When he arrived, he observed a male in a wheelchair around the middle of the intersection. When asked what he said to the male, Officer Schrock stated, "Well at that point Marion dispatch had advised that there was an active fight in the roadway. I pulled up, observed only the defen[dant], no one else. He was sweating, dirty. His mouth was bleeding." He testified that he asked defendant if someone had attacked him and asked what happened, but defendant did not want to speak with him. The officer told defendant that he wanted to help him and catch the individuals who did that to him, but the entire time defendant stated he did not wish to pursue charges. Officer Schrock stated at that time, he did not know if defendant was the main aggressor, he was just investigating the disturbance in the roadway. The remainder of Officer Schrock's testimony was consistent with that of Officer Warren except that Officer Schrock believed defendant was intoxicated based on his aggressiveness. Officer Schrock also testified about his own follow up treatment following defendant spitting in his mouth and eye which consisted of three blood draws with one more scheduled in July 2018 to ensure that everything was clear. As to Officer Burgrabe's injury, Officer Schrock testified that he did not see how the injury occurred, but he did see the injury following the incident.

¶ 21    On cross-examination, Officer Schrock confirmed that defendant's mouth was already bloody when he came upon defendant at the scene. The officer also confirmed his belief that defendant was intoxicated, both by smell and defendant's demeanor. The officer clarified that

7

defendant was not put down in the dirt but was put down on the road that had gravel. Counsel asked the officer if defendant threatened physical violence against him. The officer stated, "I don't recall the exact statements, but yes. *** [H]e was screaming obscenities the entire time, threatening both myself and Officer Warren." When asked what defendant threatened him with, the officer stated, "I don't recall." After describing the spitting incident, which involved defendant spitting a mixture of phlegm and blood in his eye that ran down the left side of his face into his mouth, the officer confirmed that when defendant reared back, he did not try to head butt the officer. The officer also confirmed that he was in the hospital room with defendant, although not the entire time. Counsel asked if defendant made any threats to the officer, and the officer responded in the affirmative. When asked what defendant said, the officer responded, "I don't recall the *** exact threats *** just—still obscenities ***." The officer also confirmed that he prepared a report regarding the incident.

¶ 22 The State's final witness was Rick Burgrabe, a correctional officer at the Williamson County jail. Officer Burgrabe stated that when defendant was coming to the jail, they received a call from the Marion Police Department advising that they were bringing in a combative arrestee. He went outside to wait for his arrival. Two Marion squad cars pulled in followed by the ambulance. He stated defendant was wearing a spit hood at that time and was strapped face down on the ambulance gurney. After defendant arrived, it was decided that the best way to get him into the jail was to wheel him in on the gurney. Therefore, defendant was wheeled through the booking area and into the corridor that was just outside the medical isolation cells. The officer stated that defendant was going to be placed in a restraint chair and housed in that area until he calmed down. The officer believed the spit hood was removed when they stopped in the corridor before they attempted to move defendant into the chair. When defendant was uncuffed to be moved, defendant

8

wedged his left hand underneath the chair and got leverage where his hand could not be pulled out. Officer Burgrabe stated it took a couple of them to get defendant's hand out because defendant was very strong with a lot of upper body strength. He testified that defendant continued to be uncooperative and said he was not going to cooperate and was going to hurt somebody. Officer Burgrabe testified that while he was helping the guy on the left get defendant's arm, defendant bit the back of Officer Burgrabe's arm just above the elbow. He stated that once they had defendant secured, the officer washed his arm and saw that he needed to go to the emergency room. Officer Burgrabe confirmed that he received medical attention for the injury that included dressing the wound, three blood draws, and visiting an infectious disease physician. He stated a fourth blood draw was scheduled in the future.

¶ 23    On cross-examination, Officer Burgrabe confirmed the jail had multiple video cameras throughout the facility, including the medical isolation cells. Thereafter, he reiterated the events that transpired at the jail. Counsel asked the officer if defendant made any threats of bodily harm toward him, and the officer stated, "Not specifically toward me. On the way in, he threatened to hurt somebody. He didn't really say who." The officer did not recall whether defendant smelled of alcohol. When asked if there were other witnesses, Officer Burgrabe stated there were three correctional officers and the ambulance staff in the corridor, and "I think actually, one of the ambulance staff was the one that pointed out that he just bit you." Defense counsel responded by saying, "So you didn't know you were bit. You just know that there was an injury to your arm, and then the ambulance—" Officer Burgrabe interrupted and said, "I just felt the sting. I didn't realize the extent of it." Counsel asked if the officer prepared a report regarding the incident and the officer confirmed that he did prepare a report. Thereafter, counsel confirmed the officer just felt a sting and that was how the officer knew he was injured. Officer Burgrabe responded by

9

stating, "Well, it's on the back of my arm. I felt the sting, and I knew something happened; but as soon as it happed, the ambulance technician said, 'He bit you.' But I couldn't see so far behind my arm." Counsel then stated, "Okay. No further questions, Your Honor."

¶ 24    Thereafter the State rested, and the court took a recess. After the jury was sent to lunch, the defense moved for a directed verdict, which was denied. The jury returned and the defense rested. After the jury was removed, the defense again moved for a directed verdict, which was denied. The defense also moved for a mistrial based on the State's failure to provide the underlying reports for Officers Schrock and Burgrabe prior to trial. The trial court noted that it was determined during the trial that the State was unaware of the reports and did not receive copies of either report. Thereafter, the court denied the motion.

¶ 25    Following closing arguments, the jury instructions were read, and the jury was sent to deliberate. After a half hour, the jury requested a copy of the State's photograph of Officer Burgrabe's bite wound. The request was denied because the State only published the picture and did not place the photograph in evidence. Thirty minutes later, the jury reached a verdict finding defendant guilty on all three counts.

¶ 26    The sentencing hearing was held on August 17, 2018. The presentence investigation report (PSI) was admitted with one clarification by defendant. The PSI revealed prior criminal cases in Cook and Jackson Counties involving aggravated vehicle hijacking, domestic battery, violation of an order of protection, possession of cannabis, obstruction of justice, and battery. The PSI also noted defendant was paralyzed from the waist down in 1997 when he was in the eighth grade following a hospitalization for asthma in which he was provided the wrong medicine. No witnesses were called by either side, and defendant declined to provide a statement in allocution.

¶ 27 In closing argument, the State relied on three aggravating factors. The first was whether defendant's conduct caused or threatened serious harm. The State noted the guilty verdict for aggravated battery to a police officer based on the spitting and stated the action "caused [Officer Douglas Schrock] to have to *** be tested over a course of six months, blood draws to test him for communicable diseases." The State also addressed Officer Burgrabe's bite and the "serious injury to his arm [for] which [he] also had to receive testing for the next six months for communicable diseases and caused a permanent scar on his arm." The State also addressed the threat to a public official in which defendant "threatened the life of Officer Noah Warren *** which is threatening serious harm to the officer." The State also addressed defendant's criminal history and reiterated defendant's prior convictions. The State's final aggravating factor was deterrence and addressed the lack of respect for officers, stating a harsher sentence would deter people from committing these types of crimes. The State asked for seven years on count II, five years on court III, and seven years on count VI.

¶ 28 In response, the defense stated defendant had a medical condition that may inhibit some of the sentencing and requested a sentence of three years on the counts with one-year mandatory supervised release (MSR) on all counts. The court took the matter under advisement.

¶ 29 The parties returned for the court's sentencing ruling on August 21, 2018. The court noted that counts II and IV of defendant's convictions were Class II felonies and count III was a Class III felony. Thereafter, the court stated:

"The Court has considered the evidence in this case, the pre-sentence investigation report; history, character, and attitude of the Defendant; arguments; and the statutory matters of aggravation and mitigation. Aggravating factors, there is One, Three and Seven. One is, Defendant's conduct caused or threatened serious harm. Three, Defendant has a history of

11

prior delinquency of a criminal activity. Seven, the sentence is necessary to deter others from committing the same crime. In reviewing the factors in mitigation, quite frankly, I do not find any. From the presentence investigation, Defendant's prior history is a Class X conviction in 2004, Class IV conviction in 2009, Class IV conviction in 2013, and the convictions here in 2018. So roughly, about every four to five years, Defendant is found guilty of another felony. Based upon all of that, I'm going to sentence the Defendant to seven years on Count II *** that will run consecutive the sentences on Counts III and IV. And I'll sentence him to five years in the Department of Corrections on Count III, seven years on Count VI ***."

¶ 30     The court explained that the sentences were consecutive pursuant to section 5-8-4(d)(8) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(8) (West 2018)) and further stated it was not all one course of action, but separate crimes. The court advised that the sentences would be served at 50% with two years' MSR. Thereafter, the court advised defendant of his appeal rights.

¶ 31     On August 28, 2018, defendant filed a motion to reconsider sentence claiming the sentence was excessive and an abuse of discretion. On October 3, 2018, the court issued a docket entry order stating, "The court has reviewed the motion to reconsider sentence, reviewed the transcript of the sentencing hearing, reviewed the case file and denies the motion to reconsider."

¶ 32     On October 16, 2018, the defense filed a second motion to reconsider stating that new evidence came to light after receipt of the August 21, 2018, transcript. Defense counsel also moved to withdraw. On February 1, 2019, the trial court granted counsel's request to withdraw and appointed new counsel. The second attorney moved to withdraw approximately two months later, at defendant's request. The request to withdraw was found to be moot because the attorney was no longer with the public defender's office. The court appointed a third attorney, who filed a motion

12

for a new trial on October 4, 2019. The State filed a response on October 15, 2019, stating the motion was untimely pursuant to section 116-1(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-1(b) (West 2018)), and the court lacked jurisdiction to consider the motion. On November 13, 2019, the trial court issued a docket entry order denying both motions. Defendant appealed on December 10, 2019.

¶ 33    On February 9, 2021, defendant moved the Illinois Supreme Court for a supervisory order related to lack of any timely appeal from the October 3, 2018, judgment, as well as the proceedings that occurred thereafter. On February 9, 2021, the Illinois Supreme Court issued an order directing this court to treat the December 10, 2019, notice of appeal as being a properly perfected appeal from the October 3, 2018, judgment. The case has now been fully briefed, and heeding the supreme court's order, we now consider defendant's arguments.

¶ 34                                    II. ANALYSIS

¶ 35    On appeal, defendant contends that his constitutional right to effective assistance of counsel was denied where his counsel repeatedly failed to object to "prejudicial hearsay" and "actively solicited prohibited information from a witness during cross[-]examination." Defendant further contends that the trial court erred by considering elements inherent in the crimes for which he was convicted during sentencing.

¶ 36                          Ineffective Assistance of Counsel

¶ 37    Both the United States and Illinois Constitutions guarantee criminal defendants the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "To establish ineffective assistance of counsel ***, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable compared to prevailing professional standards and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

13

proceeding would have been different." *People v. Cherry*, 2016 IL 118728, ¶ 30 (citing *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). To succeed on a claim of ineffective assistance of counsel, a "defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011).

¶ 38    "[T]rial strategy encompasses decisions such as what matters to object to and when to object." *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991). Similarly, "[t]he manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997). "Defendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable." *Id*. at 327.

¶ 39    Defendant contends that trial counsel's performance was defective because his counsel violated the court's orders *in limine*, failed to object when the State violated the orders *in limine*, and failed to request curative instructions following the violations. In support, defendant lists seven violations that occurred regarding the orders *in limine*.

¶ 40    Defendant claims five violations related to the first motion *in limine*, which limited Officer Schrock and Officer Burgrabe's testimony as to what happened and prohibited testimony regarding any statements they made, defendant's statements, or statements by anyone else. The defense alleged the violations of the first motion *in limine* occurred when (1) defense counsel inquired of Officer Schrock as to whether defendant threatened physical violence against him during the arrest and the officer responded in the affirmative; (2) defense counsel inquired of Officer Schrock as to whether defendant threatened physical violence against him at the hospital; (3) the State asked Officer Burgrabe about defendant's attitude, and in response that officer testified as to statements

14

made by defendant regarding his lack of cooperation; (4) defense counsel inquired of Officer Burgrabe as to whether defendant made any threats toward the officer and the response provided a statement made by defendant; and (5) defense counsel inquired about witnesses to Officer Burgrabe's injury at which time Officer Burgrabe provided a statement made by the ambulance staff following his injury and later when counsel referenced this remark.

¶ 41     We first note that the basis of the first motion *in limine* was the State's failure to provide the expected testimony for its witnesses pursuant to Illinois Supreme Court Rule 412(a) and (b) (eff. Mar. 1, 2001). While framed as a motion *in limine*, the motion was actually a motion for sanctions pursuant to Illinois Supreme Court Rule 415 (eff. Oct. 1, 1971). Based on the alleged violations, defendant's written motion requested "*the State* *** be limited in its evidence at trial to information already disclosed *** and no new or undisclosed evidence should be admissible.*" (Emphasis added.) Further, defendant's prayer for relief requested "an Order prohibiting *the State* from introducing evidence or testimony from any witness" (emphasis added) which was not previously disclosed to defense counsel.

¶ 42     By granting defendant's motion, the resulting order *in limine* sanctioned the State for its discovery violation and prohibited *the State* from procuring any testimony from Officer Schrock or Officer Burgrabe related to anything other than the events that occurred. More specifically, *the State* was not allowed to elicit testimony from the officers regarding anything defendant stated, anything the officers stated, or anything anyone else stated.

¶ 43     "The purpose of discovery sanctions is not to punish but to ensure fair discovery and a trial on the merits." *Phillips v. Gannotti*, 327 Ill. App. 3d 512, 518 (2002). As the court's order was a sanction for the State's Rule 412 discovery violation, no such preclusion was applicable to defendant. Therefore, if defense counsel believed he could procure testimony during cross-

15

examination regarding statements made by the officers, defendant, or any other person, that would benefit his client, such decision falls squarely in the realm of trial strategy.

¶ 44    While defendant claims there "was no strategic reasoning to engage in this line of questioning, and no world exists in which this testimony could possibly be viewed as beneficial to [defendant]," we disagree. Whether we believe the questions were inartfully posed or were intended as provided, no prejudice from the statements can be shown. The responses reveal that counsel was effective in procuring testimony that resulted in one officer twice testifying that he was unable to remember the exact threat posed and a second officer to testify that he did not know who the threats were directed toward. Finally, as to the final inquiry, it is clear defense counsel was trying to elicit testimony to support the fact that Officer Burgrabe did not personally see defendant bite him or know that he had been bitten, because he only "felt a sting." As such, we find defense counsel's permissible inquiries were trial strategy and decline to find such inquiries evidence of ineffective assistance of counsel.

¶ 45    This leaves only defense counsel's failure to object to the State's violation of the first order *in limine*. The violation occurred with the following exchange between the prosecutor and Officer Burgrabe:

> State: "[W]hat was [defendant's] attitude at that time?
>
> Officer: He was uncooperative. And he said he wasn't gonna cooperate, and he said he was gonna hurt somebody. And he maintained that until—
>
> State: And then what happened."

¶ 46    Once again, defendant argues that no basis for his counsel's failure to object can be found. However, "[i]ncompetency of trial counsel is not established by the mere failure to object to evidence." *People v. Fields*, 202 Ill. App. 3d 910, 915 (1990). This is so, even when the evidence

16

is inadmissible. *People v. Murphy*, 72 Ill. 2d 421, 438 (1978). The decision of when to object is purely a matter of trial strategy. *People v. Clark*, 160 Ill. App. 3d 877, 883 (1987). Here, it is possible counsel did not want the officer's testimony stricken because counsel believed he could develop the testimony to his client's benefit during cross-examination, which was exactly how counsel handled the matter here, quite effectively, as noted above. As such, even assuming counsel's failure to object was improper, defendant cannot show that he suffered prejudice as a result, and therefore, his claim of ineffective assistance of counsel fails.

¶ 47 The remaining two violations stemmed from the third order *in limine* and included one by defense counsel and one by the State. The first occurred during cross-examination of Ms. Jennings. After confirming that Ms. Jennings was the person who called 911 for the disturbance, defense counsel asked if she was inside or outside at that time. The witness responded, "Well, my daughter lives right around the corner from me. We were walking home; and we walked past them, and they were fighting in the yard." Following Ms. Jennings's testimony, the State advised the trial court that defendant "opened the door" as to the incident. Defense counsel disagreed and the trial court stated, "I don't think we need to go into it."

¶ 48 The second claimed violation occurred when the State questioned Officer Schrock as to what occurred when he arrived on scene. Officer Schrock stated, "Well, at that point Marion dispatch had advised that there was a[n] active fight in the roadway. I had pulled up, observed only the defen[dant], no one else. He was—he was sweating, dirty. His mouth was bleeding. *** At that point I didn't know if that male, the defendant, was the main aggressor. I was investigating, you know, a disturbance in the—in the roadway."

¶ 49 On appeal, defendant claims his counsel was ineffective because he elicited testimony from Ms. Jennings that she observed fighting and failed to object to the State's examination of Officer

17

Schrock because it "allowed the jury to infer that [defendant] had been involved in some sort of altercation." Defendant further claims the remainder of Officer Schrock's testimony lent "further credence to this inference by intimating that not only had [defendant] been involved in an altercation, but that he may have also instigated a fight." We disagree.

¶ 50   While there is no dispute that both witnesses testified to a fight, Ms. Jennings did not testify that defendant was involved in the fight. Further Officer Schrock's testimony was noncommittal as to defendant's involvement. His testimony did not name defendant as the aggressor and his follow up testimony revealed that defendant was potentially the victim of the original altercation as defendant was described as being in a wheelchair with injuries about his face.

¶ 51   Defendant again claims no reasonable argument can be made for defense counsel's disregard of the order *in limine* and failure to object to the State's violation of the order *in limine*. However, this court need only review the defense's closing argument to determine, both a reasonable and effective, basis for defense counsel's strategy as to count IV, which involved defendant spitting on Officer Schrock. Counsel did not want to ignore that his client was in a fight. Instead, he wanted to use his client's physical condition stemming from that incident, along with being placed down in a dirty road as the reason his client needed to spit: to remove the blood and dirt from his mouth. Counsel's closing argument contended that defendant's action was a response to the "road debris," blood, and phlegm in his mouth and that defendant did not intend to spit in Officer Schrock's mouth and eye, he just wanted to expel the dirt and blood from his mouth, which could only be done by spitting because defendant was handcuffed at that time. Counsel then stated, "[Defendant] was clearing his throat after being face down, struggling to breathe." As defense counsel's actions, and inaction, were clearly trial strategy, they do not support a claim for ineffective assistance of counsel.

18

¶ 52                                    Double Enhancement

¶ 53    Defendant also contends the trial court erred by considering elements inherent in his crimes

during sentencing. As this issue was not raised before the trial court, defendant requests plain-error

review. Our supreme court has explained that

> "the plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a
>
> clear or obvious error occurred and the evidence is so closely balanced that the error alone
>
> threatened to tip the scales of justice against the defendant, regardless of the seriousness of
>
> the error, or (2) a clear or obvious error occurred and that error is so serious that it affected
>
> the fairness of the defendant's trial and challenged the integrity of the judicial process,
>
> regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565
>
> (2007)

¶ 54    For plain-error review, this court must first determine if there was error. *People v. Walker*,

232 Ill. 2d 113, 124 (2009). If error is found, the court completes the inquiry by determining if

defendant has proven either the closeness of evidence prong or the error affecting fairness of the

hearing prong required by the doctrine, either of which would serve as reversible error. *People v.*

*Naylor*, 229 Ill. 2d 584, 602-03 (2008). "The burden of persuasion remains with the defendant

under both prongs of the plain-error test." *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). "If a defendant

fails to satisfy this burden, the result is that the 'procedural default must be honored.' " *Walker*,

232 Ill. 2d at 124 (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995)).

¶ 55    "The legislature has the power to declare and define conduct constituting a crime and to

determine the nature and extent of punishment for it." *People v. Taylor*, 102 Ill. 2d 201, 205 (1984).

Double enhancement occurs when a single factor is "used both as an element of an offense and as

a basis for imposing 'a harsher sentence than might otherwise have been imposed.' " *People v.*

19

*Phelps*, 211 Ill. 2d 1, 12 (2004) (quoting *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992)). "The prohibition against double enhancements is based on the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." *Id.*

¶ 56    The rule, however, is not to be rigidly applied, as the trial court's sentence is determined after consideration of " 'many *relevant* factors, including the defendant's demeanor, habits, age, mentality, credibility, general moral character, and social environment [citations], as well as "the nature and circumstances of the offense ***." ' " (Emphasis in original.) *People v. Thomas*, 171 Ill. 2d 207, 226-27 (1996) (quoting *People v. Saldivar*, 113 Ill. 2d 256, 268 (1986), quoting *People v. Hunter*, 101 Ill. App. 3d 692, 694 (1981)). Mere reference to the existence of an aggravating factor during sentencing is not reversible error. *People v. Brown*, 2018 IL App (1st) 160924, ¶ 22 (citing *People v. Andrews*, 2013 IL App (1st) 121623, ¶ 15). As noted by our supreme court:

> "While the classification of a crime determines the sentencing range, the severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted*." (Emphases in original.) *Saldivar*, 113 Ill. 2d at 269.

Further, one isolated comment may be insignificant when the court's focus was primarily on something else. See *People v. Newlin*, 2014 IL App (5th) 120518, ¶ 25; *People v. Bourke*, 96 Ill. 2d 327, 332 (1983).

¶ 57    Here, the trial court found that defendant's offenses were serious, restated the three aggravating factors argued by the State, and found no mitigating factors. Thereafter, the court solely addressed defendant's past criminal history, the second factor in aggravation. The court

20

made no statement regarding either the first or third aggravating factor. The trial court's recitation of the State's argument does not indicate reliance on that factor and defendant provides no evidence to the contrary.

¶ 58    However, even if the trial court relied on the State's argument regarding the first factor in aggravation, we would not reach a different conclusion. Here, the State's sentencing argument regarding the first aggravating factor addressed the officers' post-incident testing required due to the transmission of bodily fluids. Defendant's counsel conceded during oral argument that it was proper for the court to consider degrees of harm including post-incident harm, which here, consisted of extensive testing for several months after the bite occurred. Equally evident is the fact that the State's argument regarding the threat to Officer Warren involved the level of threat directed to the officer by the severity of words used by defendant, which included hiring a hit man to kill the officer.

¶ 59    Here, the trial court's reference to the first factor in aggravation merely recited arguments presented by the State. As such, no reliance can be shown. However, based on the arguments presented by the State regarding the aggravating factor, even if the trial court had considered the factor, we do not find the consideration to fall within the concerns associated with double enhancement. As such, we affirm the trial court's sentence.

¶ 60                                    III. CONCLUSION

¶ 61    For the foregoing reasons, we deny defendant's request for a new trial based on his claim that his trial counsel failed to provide effective assistance and affirm the trial court's sentence.

¶ 62    Affirmed.

21